1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                        DISTRICT OF OREGON

7                        PORTLAND DIVISION

8

9

UNITED STATES OF AMERICA,                    No. 3:11-cv-00227-HU

10

        Plaintiff,                           **OPINION AND ORDER**

11

        v.

12

**THE TUG SUNDIAL** (Vessel ID No.
13  652357), *in rem*, **BARGE 166**, *in*
*rem*, **BARGE 71**, *in rem*, **THE**
14  **PIONEER**, *in rem*, their apparel,
tackle and appurtenances; **BANK**
15  **OF AMERICA NA**, *in personam*; and
**TIDEWATER BARGE LINES, INC.**,
16  *in personam*,

17          Defendants.

18
Ron Silver
19  United States Attorneys Office
1000 S.W. Third Avenue, Suite 600
20  Portland, OR 97204-2902
Eric Kaufman-Cohen
21  Torts Branch, Civil Division
450 Golden Gate Avenue, Room 7-5395
22  San Francisco, CA 94102-3463

23      Of Attorneys for Plaintiff

24  Daniel F. Knox
Noah Jarrett
25  William J. Ohle
David R. Boyajian
26  Schwabe, Williamson & Wyatt, P.C.
1211 SW 5th Ave., Suite 1900
27  Portland, OR 97204

28      Of Attorneys for Defendants

Page 1 - OPINION AND ORDER

**HUBEL, J.,**

The United States of America ("the Government") brought this suit in admiralty against Tidewater Barge Lines, Inc. ("Tidewater"), the tug SUNDIAL, grain barges 166 and 71, and the fuel barge PIONEER to recover the cost of repairs to a lock and gate on the Columbia River that were damaged after an allision with a flotilla of barges propelled by the tug SUNDIAL.  Now before the Court is the Government's motion to compel production of all documents regarding any investigation conducted by, or on behalf of, Tidewater into the incident giving rise to this litigation. For the reasons stated herein, I DENY the Government's motion (Docket No. 73) to compel.

## ANALYSIS

The Court will only briefly summarize here the facts relevant to the instant motion.  Tidewater is a member of The American Waterways Operators Responsible Carrier Program ("RCP").  Although the RCP is a voluntary program, carrier members must remain in audited compliance with the RCP or their membership will be terminated.  In accordance with the RCP, Tidewater adheres to an incident investigation procedure when accidents occur in order to "identify immediate and underlying causes, so that steps can be taken to prevent recurrences."  (Kaufman-Cohen Decl. Ex. F at 2.) According to Tidewater's safety manual, typically two levels of reports should be produced: "An Initial Incident Report (SEQ-006) form will be submitted prior to a more detailed Incident Detail Report (SEQ-001)."  (*Id.*)  The question at the heart of this discovery dispute is whether Tidewater ever produced an Incident

Page 2 - OPINION AND ORDER

1  Detail Report because the Government has only received the former,
2  not the latter.

3      Tidewater claims that the two reports were essentially
4  collapsed into one "more-detailed-than-usual" Initial Incident
5  Report "which included all the elements of a typical" Incident
6  Detail Report. (Defs.' Resp. Pl.'s Mot. Compel at 4.) And this
7  single incident report has already been produced by Tidewater
8  during the course of discovery. The Government, on the other hand,
9  seems to suggest that an Initial Detail report does exist and is
10 cloaked as a TapRoot analysis on Tidewater's privilege log.

11     On February 29, 2008, the day after the allision which gave
12 rise to this litigation, Tidewater's counsel suggested the use of
13 the TapRoot analytic system (i.e., software used by companies to
14 investigate and fix the root causes of major accidents) "in order
15 to prepare for the claim that Tidewater recognized was sure to
16 come." (Defs.' Resp. Pl.'s Mot. Compel at 7.) Ultimately, an
17 investigation team was formulated, which was to be led by
18 Tidewater's counsel, Daniel Knox. Knox also hired a consultant,
19 Kevin McManus, in order to help facilitate and implement the
20 TapRoot system and software. Because "no remotely similar
21 investigative effort ha[d] been made in Tidewater's history," the
22 formation of the TapRoot team "was unprecedented." (Defs.' Resp.
23 Pl.'s Mot. Compel at 8.) Over the next several months, the TapRoot
24 team compiled the necessary background information and conducted
25 the TapRoot analysis. Initial conclusions were provided to
26 Tidewater's President, Dennis McVicker, in March 2008. Since then,
27 a second round of TapRoot inquiries were addressed by the TapRoot
28 investigative team over the next year.

1      Upon review, I conclude that any document produced during the
2  course of the TapRoot investigation is protected by the work-
3  product doctrine.  *See United States v. Richey*, 632 559, 567 (9th
4  Cir. 2011).   This conclusion is bolstered by the fact that (1)
5  Tidewater had never used the TapRoot software prior to Knox
6  recommending its use on February 29, 2008; and (2) the TapRoot
7  investigation goes well beyond what the RCP requires of a carrier
8  in good standing.  Accordingly, the Government's motion (Docket No.
9  73) to compel is **DENIED.**

10      As an aside, I must address the fourth entry in Tidewater's
11  privilege  log.    This  entry  originally  identified  "various"
12  statements by employees that Tidewater claimed were solicited at
13  the direction of counsel and drafted by "various employees" on
14  "various" dates.  (Kaufman-Cohen Decl. Ex. C at 1.)  Because the
15  Government took exception with the fourth entry's lack of clarity
16  in its moving papers, I addressed the matter with Tidewater's
17  counsel during the August 2, 2012 hearing on the Government's
18  motion to compel.  The following discussion ensued:

19      THE COURT: What [about] the complaint the plaintiff has
20      with the detail of the privilege log where you are
        alleged to have identified, in kind of a blanket fashion,
        several employees on several dates were interviewed
21      regarding several statements or several facts? Shouldn't
        there be more detail than that?
22

23      MR KNOX: . . . I'll happily identify the individuals I
        have -- that we interviewed.  I'll tell you right now,
        [the list includes] the four members of the crew of the
24      Sundial, all of whom have been deposed at great length by
        the government.
25

26      THE COURT:  Well, at a minimum, I'll require that you
        amend your privilege log to indicate which people were
        interviewed on what date and who was present during the
27      interview.

28      MR. KNOX:  I'll be happy to do that, Your Honor.

Page 4 - OPINION AND ORDER

1  (Mot. Compel Hr'g Tr. 19-20, Aug. 2, 2012.)

2       Four days later, on August 6, 2012, Tidewater provided the
3  Government with a third amended privilege log.  The fourth entry in
4  Tidewater's third amended privilege log has a document date of
5  "7/24/2008-4/14/2009" and is described as "20 written statements by
6  ten operators dated between January 31, 2009 and April 14, 2009
7  regarding the employees' experiences with locks on the Columbia
8  River . . . and 23 statements by 23 members of the Tidewater crew
9  (operators and deck mechanics) regarding their experience with
10 mooring lines."  (Defs.' Third Am. Privilege Log at 2.)

11      Since the fourth entry in Tidewater's third amended privilege
12 log is still too broad and does not set forth the specifics that
13 Tidewater's counsel said he would be "happy" to provide, I am
14 ordering Tidewater to amend its privilege log for a fourth time.
15 Within the fourth entry, Tidewater must provide the name of each
16 individual who provided a statement, the date the statement was
17 provided, and who was present while the statements was taken.
18 Nothing more, nothing less.

19      IT IS SO ORDERED.

20      Dated this 10th day of September, 2012.

21                              /s/ Dennis J. Hubel

22                    _____
                              DENNIS J. HUBEL
23                      United States Magistrate Judge

24

25

26

27

28