UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>   v.<br><br>THE TUG SUNDIAL (Vessel ID No. 652357), *in rem*, BARGE 166, *in rem*, BARGE 71, *in rem*, THE PIONEER, *in rem*, their apparel, tackle and appurtenances; BANK OF AMERICA NA, *in personam*; and TIDEWATER BARGE LINES, INC., *in personam*,<br><br>        Defendants. | No. 3:11-cv-00227-HU<br><br>**FINDINGS AND RECOMMENDATION** |

Eric Kaufman-Cohen
U.S. Department of Justice
Torts Branch, Civil Division
450 Golden Gate Avenue, Room 7-5395
San Francisco, CA 94102

    Attorney for Plaintiff

Daniel F. Knox
Noah Jarrett
Schwabe, Williamson & Wyatt, P.C.
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204

    Attorneys for Defendants

Page 1 - FINDINGS AND RECOMMENDATION

HUBEL, Magistrate Judge:

In this admiralty case, the United States moves for summary judgment on its second cause of action for strict liability under the Rivers and Harbors Act ("RHA"), 33 U.S.C. §§ 408 and 412, arguing that maritime comparative negligence principles do not apply in allocating the parties' liability under the RHA. The United States also moves for summary judgment on its claim for damages in the amount of $4,867,320.43, plus prejudgment interest, on the ground that there is no genuine issues of fact as to the costs incurred by the United States to repair the damage caused by the *in rem* vessel defendants to the John Day Dam Navigation Lock. For the reasons set forth below, the United States' motion (Docket No. 89) for summary judgment should be GRANTED in part and DENIED in part.

**BACKGROUND**

The United States brought this action against the tug SUNDIAL, the fuel barge PIONEER, grain barges 71 and 166, and their owner, Tidewater Barge Line, Inc., to recover for damage caused to the John Day Navigation Lock on February 28, 2008.

In order to assist navigators in properly mooring within the lock chamber, the Army Corps of Engineers has painted two yellow lines in the John Day Navigation Lock's chamber. One yellow line is painted forward of the downstream gate and another is painted 25.9 feet downstream of the upstream gate. These lines provide a benchmark for navigators and lock operators as to the vessel's proximity to either gate.

The lock has two fill valves and two drain valves. At the time of the incident, it appears that only one fill valve was in

Page 2 - FINDINGS AND RECOMMENDATION

use. The fill valve and drain valve cannot be opened at the same time without use of a bypass key. When there is an upstream lockage, as was the case here, the fill valve is not opened until the drain valve is completely closed. The procedure for operating the fill valve is to first open the valve halfway. Once the initial cavitation (e.g., formation and collapse of low-pressure air bubbles that form in the lock as water is introduced into the lock) subsides, the valve is fully opened.

There are also two lock stations at the John Day Dam, one located at each of the respective gates. During an upstream lockage, the lock operator opens the downstream gate from the downstream lock station. After the vessel enters the lock, and the vessel operator advises that they are securely tied off to a mooring bitt, the lock operator visually confirms that the stern of the tug is upstream of the downstream yellow line. The lock operator then closes the downstream gate and proceeds to the upstream lock station to confirm that the bow of the leading vessel is downstream of the upstream yellow line and closes the drain valve. When this process is complete, the lock operator begins the filling process from the upstream lock station.

On the night of the incident in question, the defendant vessels were transiting upstream on the Columbia River as a flotilla. The flotilla was made up with the SUNDIAL in the stern position as the "pusher" tug in the configuration. The fuel barge PIONEER forward of the tug SUNDIAL, and BARGE 71 and BARGE 166 were tied off side-by-side immediately forward of the PIONEER.

Upon receiving a request for an upstream lockage from the SUNDIAL, the control operator at John Day notified the on-duty lock

Page 3 - FINDINGS AND RECOMMENDATION

operator, Jerry Boushey. After being informed that the flotilla was secure in the lock, and after confirming that the stern of the SUNDIAL was within the downstream yellow guideline, Mr. Boushey closed the downstream gate and proceeded to the upstream lock station.[1] Upon confirming that the bows of the grain barges were behind the upstream yellow guideline, Mr. Boushey entered the upstream lock station and closed the drain valve. Mr. Boushey then left the lock station for an unspecified amount of time, taking his radio with him, to use the restroom.[2] When he returned, Mr. Boushey waited for the drain valve to completely close and began the filling process. Once the cavitation had subsided and the fill valve had been fully opened, Mr. Boushey logged onto the computer and began entering data concerning the flotilla into the Army Corps of Engineers' Lock Performance Monitoring System.

A few moments later, Mr. Boushey heard a loud "bang" coming from the upstream end of the lock chamber. He looked out the lock station window and saw that the bows of the grain barges were coming up under the upstream gate. Mr. Boushey immediately radioed the SUNDIAL, stating: "SUNDIAL you are under the upstream gate back up!" (Boushey Decl. ¶ 6.) Mr. Boushey also "hit the close button on the fill valve" at that time. (*Id.*) Mr. Boushey immediately radioed the SUNDIAL a second time with a similar warning. (*Id.*) The SUNDIAL's crew responded, indicating it was "trying" to back up, but was unable to do so before the "barges started lifting the

---

[1] Review of the Project Standing Orders confirms that the tug SUNDIAL's crew correctly moored the flotilla within the lock.

[2] The United States represents that the restroom is located 20 feet from the upstream lock station.

Page 4 - FINDINGS AND RECOMMENDATION

1  upstream gate, breaking the seal." (*Id.* ¶¶ 7-8.) The lock flooded
2  soon thereafter.

## LEGAL STANDARD

Summary judgment is appropriate "if pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment is not proper if factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976).

Page 5 - FINDINGS AND RECOMMENDATION

Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovick v. Life Ins. Co. of N. Am.*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e). The "mere existence of a scintilla of evidence in support of plaintiff's positions [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

## DISCUSSION

I will first address the United States' motion for summary judgment on its second cause of action for strict liability under §§ 408 and 412 of the RHA.

Sections 408 and 412 of the RHA "require, in essence, that the cost of repairing any damage to a work constructed by the United States for the aid of navigation be born by the vessel that caused the damage." *United States v. Republic Marine, Inc.*, 829 F.2d 1399, 1405 (7th Cir. 1987). Because these sections have long been understood to establish a standard of strict liability, "the vessel may be held liable without any showing of negligence on its part; the government is only required to establish that the vessel caused the damage." *Id.* at 1406. As the Seventh Circuit went on to explain:

Page 6 - FINDINGS AND RECOMMENDATION

>     Thus if the defendant vessels . . . and the government
>     both acted nonnegligently, Congress has under this strict
>     liability provision placed the liability entirely upon
>     the defendant vessels.  Such a conclusion is in accord
>     with the congressional intent to require the barge
>     industry to pay for damage it causes.  While in
>     particular cases the repair costs for such damage will be
>     disproportionately borne by particular vessels, it can be
>     assumed that insurance will in general spread such costs
>     over the industry.

*Id.* (internal citations omitted).  Courts must still consider, however, whether the government was at fault, and if so, whether the government's negligence was the sole cause of the damage. *Id.* This so-called "sole cause defense," if applicable, places the liability entirely upon the government.  *Id.* at 1406-07.[3]

The United States' argument as to why it is entitled to summary judgment on its strict liability claim can be summarized as follows: maritime comparative negligence principles do not apply in allocating the parties' liability in this action under the RHA.  As a result, because the SUNDIAL's crew violated a federal regulation promulgated for the purpose of avoiding allisions in the John Day Lock, there is no genuine issue of fact as to whether the *in rem* defendant vessels are *at least* partially at fault, thereby entitling the United States to summary judgment.

The federal regulation the United States alleges the SUNDIAL's crew violated is 33 C.F.R. 207.718, which is entitled "Navigation locks and approach channels, Columbia and Snake Rivers, Oreg[on] and Wash[ington]."  Section 207.718 provides, in pertinent part, that:

---

[3] The parties do not dispute the substantive law that applies on the issue of liability.

Page 7 - FINDINGS AND RECOMMENDATION

(k) Mooring in lock. All vessels must be moored within the lock chamber so that no portion of any vessel extends beyond the lines painted on the lock walls. Moorage within the lock chamber will be to floating mooring bits only and will be accomplished in a proper no-slip manner. . . . *The vessel operator will constantly monitor the position of his vessel and his mooring bit ties to assure that there is no fore or aft movement of his vessel and lateral movement is minimized.* Propulsion by vessels within the lock chamber will not be permitted during closure operation of a lock chamber gate or as otherwise directed by the Lock Master.

(l) Crew to move craft. During the entire lockage, the vessel operator shall constantly attend the wheelhouse, be aware of the vessel's position, and monitor radio channel 14 on frequency 156.700 MHZ, or otherwise be constantly able to communicate with the Lock Master. At a minimum, vessels shall be as vigilantly manned as if underway.

33 C.F.R. § 207.718(k)-(l) (emphasis added).

The SUNDIAL's operator, Captain Steven Laremore, has testified that he could not see the mooring bit ties while inside the lock chambers due the flotilla's configuration:

Q. On the night of February 28, 2008, the way the barges were made up and tied off with the PIONEER, fuel barge, were you able to see –

A. No.

Q. Were you able to see the cleat on the PIONEER?

A. No.  With most boats, when you have a doublewide barge, because of their size or horse power, you make up the center of the barge [and cannot see the mooring bit ties].

(Laremore Dep. 30:15-25, Jan, 31, 2012.)

Q. Is there any way you can monitor your bitt lines in that configuration . . . from the wheelhouse?

A. No.

(Laremore Dep. 54:21-23.)

Page 8 - FINDINGS AND RECOMMENDATION

1     Defendants counter by arguing that the United States "has
2 utterly failed to provide any evidence of causation." (Defs.'
3 Opp'n at 17.)   Defendants claim, and put forth evidence that,
4 hydrodynamic forces caused by the United States' chosen procedures
5 for filling the lock pool caused the flotilla's mooring lines to
6 part, which was the sole cause of the allision with the lock gate.
7 In support of their position, Defendants cite the computational
8 fluid dynamics ("CFD") analyses of the John Day Lock that was
9 conducted by naval architect John Waterhouse and his firm, Elliot
10 Bay Design Group.  Mr. Waterhouse's declaration indicates the
11 following:

>   4. I oversaw the CFD Analyses. My firm employed several industry standard computer programs during our work. We modeled the geometry of the lock, the barge flotilla, and the lateral pit where water enters the lock when filling. This geometry was then transferred into our CFD program, StarCCM+ developed by CD Adaptco. This is a mature software program that effectively divides the fluid body into thousands of discrete cells. The program can then calculate the fluid properties within each cell for a given moment in time. Using an iterative process it adjusts the flow and pressure values until the boundary conditions are balanced for all of the cells for that moment in time. The program then moves to the next moment in time and repeats the process. By this means, we were able to calculate the flow and pressure patterns within the lock as it filled with water. At the time of the allision between the barge flotilla and the upstream lock gate, the Army Corps of Engineers was only using one valve, thus feeding water into the south laterals only. This filling pattern, combined with the geometry of the barge flotilla, set up a resonant wave of low amplitude within the lock.
>
>   5. Based on my evaluation of the data, I am convinced that the resonant wave in the lock created sufficient force on the vessels to part the mooring line.
>
>   6. The pressure fields as calculated by the CFD program produced forces acting on the barge flotilla as the resonant wave moved back and forth in the lock. The mooring lines were thus subject to an oscillating load. When the Army Corps of Engineers increased the flow into the locks at approximately [halfway through the lockage

Page 9 - FINDINGS AND RECOMMENDATION

>    process], this resulted in higher forces on the mooring lines and more energy in the resonant wave. This increased energy caused the mooring lines to part.
>
>    7. The changing accelerations resulting from the resonant wave were below the human detection threshold. I would not expect a seaman standing on any of the vessels in the lock to feel them.

(Waterhouse Decl. ¶¶ 4-7.)

In the court's view, the dispositive issue here is whether there is a genuine issue of fact as to whether the United States was the sole cause of damage caused at the John Day Dam on February 28, 2008. To begin, the court must dispose of a few arguments raised by the United States. First, the United States claims it is undisputed that Captain Laremore failed to constantly monitor the position of the flotilla during the lockage.[4] Viewing the evidence in the light most favorable to Defendants, Captain Laremore may have violated 33 C.F.R. §207.718 by failing to monitor his mooring bit ties, but the record does not necessarily support the conclusion that he violated the regulation by failing to monitor the position of his vessels. Indeed, Captain Laremore indicates he "monitor[ed] the position of the vessels in the lock as if we were underway [in accordance with 33 C.F.R. § 207.718]," and he "remained in the pilot house throughout the lockage, monitoring the position of the tug, and attending to the log and data entry, just as [he] would if the tug were underway." (Laremore Decl. ¶¶ 6-7.)

---

[4] In its opening memorandum, the United States stated, "[i]t is undisputed that on the night of the allision, the Master of the SUNDIAL, Capt. Steve Laremore, violated 33 C.F.R. § 207.718(k) and (l), by not constantly monitoring the tug's position in the lock, *and* by his failure to monitor his mooring bits ties." (Pl.'s Mem. Supp. at 14) (emphasis added).

Page 10 - FINDINGS AND RECOMMENDATION

Second, the United States argues that the mooring lines used the SUNDIAL's crew were defective:

> The video should make short shrift of any argument that excessive turbulence, or a surge within the lock, caused the mooring lines securing the flotilla to part. A more plausible explanation is that the lines used to moor the flotilla were either simply in such bad shape that they were not up to the task, or the vessels were not properly tied-off.

(Pl.'s Mem. Supp. at 11.) No evidence in the record points to the condition of the mooring lines as being defective. While it is certainly logical to argue to a finder of fact that it is more plausible to conclude that the mooring lines are defective than to accept the theory espoused by the defendants' expert, that is simply argument, and not a conclusion the court may reach on summary judgment unless the court can say no reasonable juror could adopt the theory of defendants' expert. Whatever my findings of fact would be if I had that role in this case, I do not have it now on summary judgment. Further, I cannot say no reasonable juror could accept the defense experts' theory on the record before the court now.

Third, and finally, the United States argues that Captain Laremore's response to Mr. Boushey's warning calls was entirely inadequate, which caused the barges to allide with the upstream gate.[5] The United States' argument flips the summary judgment

---

[5] "Despite two calls from the lock operator warning the Master of the SUNDIAL that they were too close to the upstream gate, and the lock operator's order to back up, no measures were taken by the tug to reverse its course until it was too late. The failure on the part of the tug's operator to take immediately preventative measures after receiving the first call from the lock operator caused the push knees of the grain barges to allide with the upstream lock wall, causing the vessels to bounce back." (Pl.'s Mem. Supp. at 2.)

Page 11 - FINDINGS AND RECOMMENDATION

standard on its head by taking the evidence in the light most favorable to itself. The record suggests Mr. Boushey's attempts to radio Captain Laremore, and Captain Laremore's response thereto, occurred within a matter of seconds. And Captain Laremore indicated he was "trying" to take preventative measure. In other words, he was in process of doing so, but had to wait for the tug's engine to come up to power since the throttle had been placed in the neutral position in accordance with the John Day Navigation Lock's Standing Operating Procedure. Mark Cline, who has operated the SUNDIAL and is familiar with its ability to react to throttle input, has stated: "I believe the tug would have required close to a minute before the tug generated reverse thrust," and "it would have taken at least another thirty seconds before the tow would have reversed direction." (Cline Decl. ¶ 9.)

It is conceded that Captain Laremore could not see his mooring bit ties, (Summ. J. Hr'g Tr. at 9, Dec. 5, 2012), which the United States asserts is a violation of 33 C.F.R. §207.718. According to the United States, the Fifth Circuit's decision in *United States v. Tug Colette Malloy*, 507 F.2d 1019 (5th Cir. 1975), is "quite instructive on the issue of how a vessel's violation of a federal regulation negates the application of the sole cause defense under the RHA." (Pl.'s Reply at 14.) In *Tug Colette*, it was admitted that the barge struck and damaged the United States' floodgate. *Tug Colette*, 507 F.2d at 1022. On appeal, the controversy stemmed

> from the *trial court's findings of fact* that neither the failure to give fog or sound signals [as required under C.F.R. 207.180(d)(2),] nor the lack of effective communication between lookout and wheelhouse contributed to the collision and that the sole cause of the accident was the [United States'] gateman's failure to open the floodgates earlier.

Page 12 - FINDINGS AND RECOMMENDATION

*Id.* (emphasis added).  The Fifth Circuit in *Tug Colette* deemed the trial court's findings clearly erroneous, stating:

> It is true that the west gateman heard by radio that the east gateman had allowed the tug and barge to pass through the east gates and enter the river.  This was some notice of the approach of the vessels. It is also true, however, that had the Tug COLETTE MALLOY complied with the duty imposed by 33 C.F.R. 207.180(d)(2) by giving the requisite sound signals and waiting for the answering signals of the gateman no collision would have occurred.  This omission contributed to the accident. Similarly, fog signals sounded during the river crossing would have alerted the gateman that the tug was near. The gateman, aided by these signals, could have accurately judged just when the gates should have been opened, keeping river debris out of the canal in the interim. Finally, if the tug's captain had been apprised that the gates were closed immediately as that fact became known to the lookout, the accident might have been averted. . . . [Thus,] the vessels are . . . liable under the [RHA] -- but for the reason that as a matter of fact and law the United States was not solely at fault in causing the accident.

*Id.* at 1023 (emphasis added).

For two reasons, the United States' reliance on *Tug Colette* is unpersuasive.  First, *Tug Colette* supports the proposition that the violation of a federal regulation can negate a sole cause defense. But that is not always necessarily so.  As *Tug Colette* held, the violation of the regulation must have "contributed to the accident."  That factual determination should be left for trial. Second, it appears the Fifth Circuit reviewed the district court's findings of fact after a court trial.  At this stage, this court cannot make findings of fact.  Instead, the court must determine whether there is an issue of fact regarding Defendants' sole cause defense.  Without out the benefit of being able to evaluate witness credibility or seeing Defendants' theory subjected to the test of cross-examination, the court cannot say that no reasonable trier of fact could conclude that the United States was solely at fault when

Page 13 - FINDINGS AND RECOMMENDATION

viewing the evidence in the light most favorable to Defendants. Accordingly, the court recommends denying the United States' motion for summary judgment on the issue of liability.[6]

Lastly, I will address the United States' claim that it is entitled to summary judgment on the issue of damages. The Eighth Circuit's decision in *United States v. Capital Sand Co., Inc.*, 466 F.3d 655 (8th Cir. 2006), is instructive on this issue. There, the court recognized that admiralty cases only require the United States "to prove that the amount claimed as damages, including overhead is a fair and reasonable charge for the repairs and necessary to complete the job." *Id.* at 658 (citation and internal quotation marks omitted).

Defendants oppose the United States' motion for summary judgment on the issue of damages on the grounds that (1) the United States' counsel failed to confer regarding a motion for summary judgment as to damages; rather, the United States' counsel only conferred as to the liability motion; (2) the United States has not demonstrated that each charge was reasonable and necessary; (3) the United States' "claim for almost $25,000,000 in penalties would remain outstanding even if the Court granted the summary judgment now sought," (Defs.' Opp'n at 6); and (4) the United States fails to address Defendants' limitations defense which would limit the United States' recovery to the SUNDIAL's post-accident value of $2,500,000.00.

---

[6] Because of this disposition, the court need not address Defendants argument that the United States' alleged "[s]poliation of [e]vidence, alone, should prevent the summary judgment it seeks" on the issue of liability. (Defs' Opp'n at 23.)

Page 14 - FINDINGS AND RECOMMENDATION

In a footnote in his reply brief, the United States' counsel claims Defendants' conferral argument "is quite disingenuous in light of the fact that the Government has on numerous occasions advised Defendants that it planned on moving for summary judgment on both liability and damages." (Pl.'s Reply at 25 n.25.) He goes on to explain that, "given Defendants' refusal to admit liability, a denial of damages is implicit." (*Id.*)

Considering it is far from uncommon for a party to move for partial summary judgment on liability, and leave open for trial the question of damages, the court considers counsel's explanation entirely inadequate. This is not the first time counsel has been admonished for failure to comply with the Local Rules. Unfortunately, the court feels compelled to remind counsel, once again, that the court may deny any motion that fails to meet Local Rule 7-1(a)'s certification requirement. The court will not do so here because this is a Findings and Recommendation and the court wishes to facilitate a decision on the merits. However, the court cautions counsel that further failure to comply fully with the Local Rules will not be tolerated.

The United States has, in essence, moved for partial summary judgment on damages, arguing that the $4,867,320.43 in costs incurred to repair the upstream gate of the John Day Navigation Lock was "a fair and reasonable charge for the repairs and necessary to complete the job." *Capital Sand*, 466 F.3d at 658. The United States did not move for summary judgment on Defendants' limitation defense or its claim for civil penalties under § 411. (*See* Pl.'s Mem. Supp. at 22-23.)

Page 15 - FINDINGS AND RECOMMENDATION

1      Donald Erickson, the project manager for the Columbia River
2 projects for the United States Corps of Engineers, has provided a
3 detail sheet describing the extent and cost of the repairs incurred
4 as a result of the allision on February 28, 2008. (Erickson Decl.
5 ¶¶ 3-39, Ex. A.)  John Murdoch, a marine surveyor retained by
6 Defendants to assess the damage at the John Day Navigation Lock,
7 estimated that repairs would cost $5,000,000.00. (Kaufman-Cohen
8 Decl. Ex. H at 4.)  In the court's view, Murdoch's estimate
9 supports the conclusion that the United States' costs were fair and
10 reasonable and necessary to complete the job.
11      Defendants only take two specific exceptions to Erickson's
12 detail sheet and description of the cost of the repairs incurred.
13 First, Defendants argue that the United States does not explain how
14 its floating bulkhead contract swelled from an initial estimated
15 amount of $856,440.00 to a total of $1,518,576.67.  The court
16 disagrees. A review of paragraphs 19-21 of Erickson's declaration
17 indicates that the contract was "for an initial amount of
18 $856,440.00 and performance period of 130 days," but "[o]ptions
19 were exercised in the contract to extend the performance period up
20 to the time of the navigation lock closure for repairs" which
21 increased the total to $1,518.576.67.  (Erickson Decl. ¶¶ 19-21.)
22      Second, Defendants argue that the United States has failed to
23 present evidence that its "'report writing' and various other
24 administrative expenses were reasonable."  (Defs.' Opp'n at 27.)
25 Presumably, Defendants are referring to the first item on the
26 detail sheet provided by Erickson, which is entitled "Letter
27 Report, Plans/Specs, and Project Management Plan." (Erickson Decl.
28 Ex. A.)  In his declaration, Erickson explained that the "total

Page 16 - FINDINGS AND RECOMMENDATION

cost for the Letter Report, Contract Documents, and Project Management Plan was $246,415.60; $237,771.10 for labor costs and $8,644.50 for a survey of the gate, travel to and from the accident and storage site, Computer Aided Design & Drafting (CADD) services, and reproduction of contract drawings." (Erickson Decl. ¶ 5.) According to Erickson, these costs lead to the completion of the following tasks:

- A thorough inspection and documentation of the condition of the gate, counterweights, gate machinery, and infrastructure (i.e., hatches, pedestals, hand rails, gratings, etc.) and related structural, mechanical, and electrical components of the gate system.
- Determination as to immediate repairs required, including repair or replacement of the gate, counterweights, gate guides, wire ropes, and other structural, mechanical and electrical systems.
- Recommendations as to what actions would be required to operate the Navigation Lock until repairs could be made.
- Design and engineering analysis required for the contract documents (plans/specs) that specified the type and sequence of repairs required to repair the gate based on the Letter Report.
- Preparation of a Project Management Plan that established scope, schedule, budgets, and technical performance requirements for the management and control of the project from planning, engineering, and design through construction.

(Erickson Decl. ¶ 4.)

Page 17 - FINDINGS AND RECOMMENDATION

In short, Defendants have not pointed to any facts that convince the court there is a genuine issue for trial as to whether the United States' $4,867,320.43 in costs were a fair and reasonable charge for the repairs and necessary to complete the job.

**CONCLUSION**

Consistent with the discussion above, the United States' motion (Docket No. 89) for summary judgment should be GRANTED in part and DENIED in part.

**SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due **March 6, 2013**. If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due **March 25, 2013**. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 15th day of February, 2013.

/s/ Dennis J. Hubel

_____
DENNIS J. HUBEL
United States Magistrate Judge